In re Howell, Bankrupt.

(No. B72-3521—Decided March 23, 1973.)

United States District Court, Northern District of Ohio, Eastern Division.

*Mr. Robert J. Shockling*, for the trustee in bankruptcy.
*Mr. Alton L. Rinier*, for the bankrupt.
*Mr. John F. Buckman* and *Messrs. Day, Ketterer, Raley, Wright & Rybolt*, for The Timken Company.

Williams, Bankruptcy Judge. This matter came on to be heard by this court on December 27, 1972, upon an Application for Turnover Order filed on December 8, 1972 by the duly appointed and acting trustee herein, Robert J. Shockling. This court, on said date, issued its order to the bankrupt and to his employer, The Timken Company, to appear and show cause why certain funds held pursuant to a trust agreement created and established by The Timken Company and credited to the account of the bankrupt should not be ordred transferred to the trustee.

Upon evidence presented at the hearing, at which all parties were present and represented by counsel, and the briefs of the bankrupt, the employer and the trustee, the court makes its Findings of Fact as follows:

FINDINGS OF FACT

1. Norma Jean Howell, wife of the bankrupt, on August 1, 1972, filed a complaint seeking a divorce from the bankrupt in the Stark County Court of Common Pleas, Division of Domestic Relations.

2. On the same date, a judge of said court signed a judgment entry, approved by the bankrupt and his wife, ordering that a separation agreement entered into by the

parties shall "be in full force and effect during the pendency of this action." Said separation agreement is dated July 29 (no year stated), was signed by the bankrupt and his wife but *was not acknowledged until October 20, 1972.* Said separation agreement contains the following provision:

"6 Husband agrees and does hereby grant and assign to his minor child, Melvin Lee Howell, Jr., his entire Security Savings Account at The Timken Roller Bearing Company, Security Savings Account No. —————————, in the approximate sum of ————————, free and clear of any claims of the Husband and the Wife, to be used specifically for the education of Melvin Lee Howell, Jr., and Husband agrees to notify The Timken Roller Bearing Company, Security Savings Department, of this grant and assignment to said Melvin Lee Howell, Jr."

3. Melvin Lee Howell was adjudicated a bankrupt upon his filing on August 14, 1972 of a voluntary Petition in Bankruptcy which he executed on August 11, 1972. The Statement of Affairs attached to said petition makes no mention of a pending divorce action but does note his execution of a separation agreement "whereby certain of the bankrupt's property was transferred to Norma Jean Howell in satisfaction of support for their minor child, Melvin Lee Howell, Jr., and alimony."

4. A Decree of Divorce was entered by the Stark County Court of Common Pleas, Domestic Relations Division, on October 20, 1972, which decree incorporates a separation agreement entered into by the parties and approves the same. Said separation agreement is apparently identical to that which was approved by the domestic relations court "during the pendency of the action" as hereinabove set forth.

5. The Security Savings Trust, which the trustee in bankruptcy seeks to reach, was established by The Timken Company in 1962 "for certain non-bargaining hourly rated and salaried employees," which included the bankrupt.

a. The trust agreement permits an employee to elect to save by payroll deduction, from 1% to 6% of his gross wages each pay period, to which the company will add,

from profits, an amount equal to 60% of the employee's savings each month.

b. Employee and employer contributions, under the option chosen by the bankrupt, are deposited in a bank of the employee's choice, in an account entitled "Timken Company Security Savings Trust Agreement."

c. Contributions by employee and employer are made to the employee's account until December 31 of the year in which said account is opened. The account is then closed for all purposes except crediting of income until distributed to participating employees, two full years after it has become closed.

d. Each January 1 sees the opening of a new class year for contributions by employee and employer. Contributions made in 1970, therefore, do not become available for distribution until January 1, 1973.

e. Upon maturity (three years after the start of the class) each employee's share of the entire amount accumulated in the savings account for the year in question is distributed to him by the trust by means of an account transfer.

f. As to separated employees, distribution will be made as of the first day of the month immediately following the month of separation.

g. The employee may change the amount of his contribution, or terminate making any contributions at the end of any calendar quarter.

6. The agreement between The Timken Company and its trustees contains the following provision:

"ARTICLE VI. RESTRICTIONS ON ALIENATION.

"No right to any moneys received by the Trustees for the benefit of a participating employee, or to any interest earned thereon, or to any amounts which the Company is to contribute to the Trustees under the Plan, shall be subject to alienation, assignment, encumbrance, pledge, sale or transfer in any manner or of any kind prior to the distribution of such amounts to the employee in accordance with the Plan and this Agreement. If at any time prior thereto a participating employee shall attempt to alienate, assign, encumber, pledge, sell or otherwise transfer any rights to

amounts held or to be received for his benefit by the Trustees, such attempted alienation, assignment, encumbrance, pledge, sale or transfer shall be of no effect; and the Trustees shall thereafter distribute such amounts, in their sole discretion, for the benefit of the employee, his or her spouse, children or other dependents, or any of them. In no event shall any person be entitled to the payment of any amount held by the Trustees prior to the time when such amount is distributable to the employee in accordance with the Plan."

7. The bankrupt had, on August 1, 1972, balances in his accounts under the trust, as follows:

|  | 1970 | 1971 | 1972 |
|---|---|---|---|
| Bankrupt's Contribution | $479.87 | $557.95 | $360.73 |
| Interest on Bankrupt's Contribution | 50.70 | 29.51 | 4.90 |
| Total Employee Portion | $530.57 | $587.46 | $865.63 |
| Company Contribution | $259.58 | $334.81 | $216.41 |
| Interest on Company Contribution | 27.43 | 17.71 | 2.94 |
| Total Company Portion | $287.01 | $352.52 | $219.35 |
| Total of Account | $817.58 | $939.98 | $584.98 |

8. The bankrupt had not, as of the date of the hearing herein, complied with the provision of the separation agreement above referred to, in that he had given no notice to anyone of his efforts to assign his interest in the trust to anyone.

QUESTIONS PRESENTED

1. Does the Bankruptcy Court have jurisdiction to determinine the availability of any funds in the trust in view of the filing of the divorce action prior to the date of adjudication?

2. Assuming question No. 1 is answered affirmatively, does the trustee in bankruptcy have any right to funds in the bankrupt's account in the trust and if so, does such

right extend to any funds other than those available on January 1, 1973?

OPINION

I.

The bankrupt, in his brief in opposition to the trustee's Application for a Turnover Order, and again orally at the hearing herein, objects to the jurisdiction of this court for the reason that a divorce action was pending on the date of adjudication. It is to be noted that no mention of such action was made in the bankrupt's Statement of Affairs attached to his Petition in Bankruptcy. The bankrupt takes the position that since the trustee failed to intervene in the state court case to contest the validity of its orders with respect to property of the bankrupt, particularly with reference to his attempted assignment of his interest in the trust, he has waived any interest therein and is bound by the state court's action.

The familiar provision of Section 70a of the Bankruptcy Act vests the trustee with the title of the bankrupt, as of the date of the filing of his petition, to all property of the kind under consideration here. Naturally, if the bankrupt has successfully and properly divested himself of title prior to adjudication, the trustee is without interest. But we have before us not a perfected assignment nor a judgment lien rendered by a state court but rather a promise by the bankrupt to effect an assignment, which he admittedly has never done, which promise is contained in an agreement approved by a domestic relations court *pendente lite* and which was not formally incorporated as a part of a Decree of Divorce until October 20, 1972, more than two months after the bankrupt's adjudication in this court. Whatever the effect of the "judgment entry" entered by the domestic relations court approving the separation agreement at the time of the filing of the divorce proceeding, it certainly did not have the force and character of a judgment lien which this court feels it must respect to the exclusion of the rights of the trustee in bankruptcy.

Logic militates against the position urged by the bankrupt. All a potential bankrupt, who is also plagued by

domestic troubles as so many seem to be, need do to thwart his creditors is to *agree* with his spouse that he will transfer property in satisfaction of his duties of support and alimony; and by having such an agreement "approved" by a divorce court simultaneously with the mere filing of a complaint for divorce, says the bankrupt herein, all such property is beyond the reach of the subsequently appointed trustee in bankruptcy unless he proceeds in the state court in some fashion.

Section 70 simply does not support this theory. The bankrupt has not divested himself of all of his rights with respect to his interest in this trust. He admits not complying with the provision that he notify his employer of his assignment of his interest in the trust. The parties in the divorce action had every right to amend their separation agreement prior to final decree or to reconcile their differences entirely making the separation agreement null and void. Whether the incorporation of the separation agreement's provision respecting the trust in the *final decree* terminated the trustee's interest, need not be answered here for bankruptcy preceded the divorce decree by more than two months.

There is no citation of authority presented this court to the effect that the filing of a divorce action places a cloak of protection around a bankrupt's property which makes it safe from the reach of the trustee in bankruptcy. The trustee, under Section 70a, has succeeded to the interest of the bankrupt in any property of the bankrupt on the date of adjudication. On that date, the bankrupt had an interest in and certain rights to several hundreds of dollars in the subject trust, unfettered by anything more than his executory agreement with his wife to transfer his interest in the trust funds to his son. It is not incumbent upon the trustee under these circumstances to ask the state court's permission to act on behalf of the bankrupt's creditors; the Bankruptcy Act has clothed him with that authority.

## II.

The question of the availability to the trustee of the funds of the bankrupt in the trust involves, essentially,

the effect of the quoted provisions of Article VI of the Amended Trust Agreement set forth in Finding of Fact No. 6 above. Having found that the separation agreement entered into by the bankrupt and his wife has not effected a transfer or assignment of the bankrupt's interest in the trust, the court must now decide whether the quoted restrictive language prevents the trustee from reaching such funds.

Of basic importance, of course, is the provision of Section 70a of the Bankruptcy Act providing that: "The trustee of the estate of a bankrupt * * * shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered: * * *." The subject restrictive language is at least similar to that usually employed in the creation of the so-called "spendthrift" trust, long a popular and widely used vehicle for the transfer of valuable property to one incompetent by virtue of age or infirmity with the expectation that the creditors of the transferee will not be able to reach such property either as a result of the transferee's improvident handling of his affairs or through judicial process against him. Whether or not the trustee in bankruptcy becomes vested with the interest of the bankrupt as a beneficiary under such a spendthrift trust depends upon the law of the state to which the trust is subject. See 3 Remington On Bankruptcy, Section 1220.

The law of Ohio on the subject is, to say the least, "confused" as Dean Griswold has pointed out. See Griswold, Spendthrift Trusts (2d Ed.) Section 213. It is possible to find in this state, decisions taking both sides of the question, with dicta to the effect that trusts of this kind are invalid, and statements in other cases in which the validity of the spendthift trust is apparently assumed or ap-

proved. 49 Ohio Jurisprudence 2d, Spendthrifts, Section 8.

A 1956 Common Pleas Court decision, *McWilliams* v. *McWilliams*, 74 Ohio Law Abs. 535, at 538, sustained a spendthrift clause against an attacking creditor on the ground that "a person having the absolute title to money or personal property has the right to dispose of it as he wishes, either during his lifetime or at his death through proper testamentary disposition, and this power of disposition is limited only by some lawful prohibition or as being against public policy. Within these limits, such person can impose any restrictions to such disposition as he desires, and may do so by the use of such instruments as a trust indenture or a will." Holding that "the courts of this state will enforce such trust instruments so long as they are not unlawful or against public policy," the court cited *Adair* v. *Sharp* (1934), 49 Ohio App. 507.

The fundamental premise of *McWilliams, supra, i. e.*, that "a person having the absolute title to money or personal property has the right to dispose of it as he wishes," is criticized by Dean Griswold. Such an argument is, he says, "patently fallacious." It is just as easy, he declares, "to assert that the owner of property may not dispose of it as he wishes. And the latter assertion finds support in many instances of the law." The author goes on to cite dower laws, statutory provisions for spouses in lieu of testamentary disposition, prohibitions against bequests for charitable purposes except by a will executed a specified time before death and prohibitions of dispositions for purposes illegal or against public policy as refutations of the type of argument used in *McWilliams*. See Griswold, *supra*, Section 552 and 553.

Dean Griswold concludes his remarks relative to the "freedom of disposition" argument, as follows: "* * * There is no syllogistic basic for the spendthrift trust. If such trusts are valid it is not because the owner of property may dispose of it as he sees fit, but because the particular restriction in question is not contrary to public policy. * * *" Griswold, *supra*, Section 554.

The Supreme Court of Ohio, in 1963, had before it the question of the validity of restrictions against involuntary

alienation of property by the beneficiary of a trust.

Limiting its holding to the situation where a trust beneficiary has "continuing and enforceable rights" to obtain some direct benefit thereunder, the court, in a 4-3 decision, held that, "[L]egislative authority is necessary to give effect to the intention of the settlor of a trust that creditors of a beneficiary thereof should not reach [such rights] * * *." *Sherrow* v. *Brookover*, 174 Ohio St. 310, paragraph three of the syllabus.

"The provisions of a trust agreement cannot prevent the continuing and enforceable rights of a beneficiary to obtain some direct tangible benefit thereunder from being applied toward satisfaction of a judgment against such beneficiary." *Sherrow*, paragraph four of the syllabus.

The court specifically noted that the words "continuing and enforceable rights * * * to obtain some direct tangible benefit" are used to differentiate from "the problem involved where there is a provision that the interest of the beneficiary shall cease if he sells or if his creditors attempt to reach it. * * * In such an instance, the beneficiary would no longer have 'continuing and enforceable rights * * * to obtain some direct tangible benefit.' " *Sherrow*, p. 312.

The clause under consideration here does provide that an attempted alienation, assignment or other transfer of his interest by a participating employee shall be of no effect and the trustees shall thereafter distribute in their sole discretion for the benefit of *the employee*, his spouse or children or any of them. Thus the *enforceable* rights of the employee-beneficiary of this trust cease, even though he may still receive benefit of future distributions.

This provision, The Timken Company maintains, makes the holding of *Sherrow* inapplicable to the clause we are considering. However, there remains no conclusive, authoritative statement in Ohio law relative to the situation at hand and this court finds Dean Griswold's suggested basis for holding a spendthrift clause valid, *i. e.*, that it is not contrary to public policy, as useful as any guideline.

What, then, shall we conclude that public policy requires in the instant situation?

It is the opinion of this court that permitting a wage

earner to place up to 6% of his income, plus an additional 60% of that amount beyond the reach of his creditors, would be contrary to "public policy" whatever that nebulous term may entail. In effect, the employee-beneficiary is acting as his own settlor in creating a spendthrift trust, a practice universally condemned. *Sherrow* v. *Brookover, supra,* p. 314. The Timken Company's reply brief attempts to distinguish the instant provision from the "ordinary spendthrift trust situation" without, in my judgment, success. The fact remains, even though the employer and employee are joint contributors to the trust, under a contractual arrangement, nevertheless there would be no fund whatever unless the employee-beneficiary first put up his money. The same argument is applicable against the company's position that at least *its* contributions cannot be reached by creditors; there would be no such contributions were it not for the triggering effect of the employee's authorization to withhold an amount he designates from his pay.

The Supreme Court's statement in *Sherrow, supra,* p. 314, that "authorities are unanimous in holding that an owner of property may not create for himself a spendthrift trust that will be valid against his creditors," is supported by Bogert, Trusts and Trustees (2d Ed.), Section 227, wherein Ohio is cited as one of the "few" states where spendthrift trusts are not recognized to any extent. *Griswold, supra,* Section 493, sums up the matter well:

"* * * So far as creditors are concerned, the question is whether a man can manipulate his own proprety so that he retains the benefit of it but is nevertheless able to avoid using it to pay his debts. The uniform answer to this question is that he can not. * * *"

Having arrived at the conclusion that the bankrupt's interest in the subject trust passed to his trustee in bankruptcy on the date of adjudication we must now determine the extent of the bankruptcy trustee's rights. Clearly, he is entitled to those funds available on or immediately after January 1, 1973, including contributions of both employee and employer and the interest thereon. Such sums total, apparently, $817.58.

Funds in the trust for 1971 and 1972, however, present,

another problem. The trust agreement bars the employee from obtaining any of such moneys until January 1, 1974 and January 1, 1975, respectively. The trustee in bankruptcy obtains no greater right therein than has the bankrupt. By waiting until the prescribed distribution date, or until the bankupt teminates his employment, the trustee may obtain the $939.98 and $584.98 the bankrupt had in the trust for 1971 and 1972 as of August 1, 1972. However, efficient administration will not permit holding this case open to await distribution in the normal course, and the trustee in bankruptcy is therefore directed to sell, at public or private sale, the interest of the bankrupt in funds accrued to his account in The Timken Employees' Savings Trust as of the date of adjudication.

*It is so ordered.*